**MATHESON LAW FIRM, P.C.**
**Andrea L. Matheson**
**2553 E. Broadway Blvd.**
**Tucson, Arizona 85716**
**Telephone: (520) 870-6400**
**Facsimile: (520) 624-7423**
**Arizona State Bar No. 018909**
**Mathesonlawfirm @gmail.com**

Attorney for: Chris Nero

# IN THE UNITED STATES DISTRICT COURT

## IN THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 08-0744-TUC-CKJ |
| Plaintiff, | |
| VS. | |
| CHRIS NERO, | **DEFENDANT NERO'S SENTENCING MEMORANDUM** |
| Defendant. | |

It is not expected that excludable delay under Title 18, USC Sec. (h)(1)(F), will occur as a result of this motion or of an order based thereon.

Defendant, Chris Nero, by and through counsel undersigned, hereby submits his sentencing memorandum requesting that this Honorable Court consider all factors in imposing a just sentence. The specific grounds for this request are more fully set forth in the accompanying Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this date, October 25, 2010.

*S/ Andrea L. Matheson*
ANDREA L. MATHESON
Attorney for Chris Nero

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   FACTS:

As a result of a government enforcement action labeled "Operation Cash Back", Chris Nero was charged in a forty-eight count indictment with wire fraud, conspiracy to commit wire fraud, transactional money laundering and conspiracy to commit money laundering, as well as forfeiture allegations for mortgage fraud related offenses for events that occurred from on or about July 23, 2003 and continuing to at least May 11, 2005, within the District of Arizona.

The government presented the case to the Grand Jury which returned an indictment against Mr. Nero on or about June 11, 2008, charging him in all forty-eight separate counts in the indictment.

From March 1, 2008 through June 18, 2008, "Operation Cash Back," in Arizona resulted in a number of mortgage fraud cases in which approximately 36 defendants were charged. Thirty arrests were made in mortgage fraud-related cases in the Tucson and Phoenix areas. During this investigation, the FBI estimated that approximately $100 million in losses were sustained as a result of fraudulently obtained loans in Arizona. In the lending fraud cases, the activity usually alleged was multiple loan transactions by mortgage professionals which constructed mortgage transactions based on fraudulent misrepresentations about the borrower's financial status, such as overstating the borrower's income or assets, using false or fictitious employment records or inflating property values.

In the instant case, Mr. Nero was the owner of Make It Happen Real Estate Investors, Inc., (M.I.H.), an Arizona corporation, who along with Roy Fife, a real estate agent with ReMax, contacted individuals who were attempting to sell their homes "by owner" and convinced them to enter contracts with buyer/investors which assured the sellers a certain sum from the sale and with Mr. Nero and Mr. Fife receiving payment from the transactions. This process became known as 'flipping houses', a practice common in the housing market before the housing collapse. (See, attached as Exhibits A & B, affidavits of Frank Carrillo.)

Mr. Nero would recruit buyers, pay for the loan application fees, and assist with any down payment while Mr. Fife located the actual properties. The loan applications were prepared with most of these applications containing material misrepresentations of which the most significant was that the properties would be owner occupied. In some cases, false documents were created in support of the loan applications. Seventeen properties were involved in this scheme with approximately 27 mortgages being prepared for and on behalf of the buyers. Some of the properties were sold prior to the loans going into default but the majority of the properties went into foreclosure with the lenders suffering losses as a result of these loans. See, PSR ¶¶ 6-10.

Mr. Nero asserted during the prosecution of this case that he acted on the advice of counsel, Jerry Laney, a licensed and practicing real estate attorney in State of Arizona, and consistent with the real estate market practices utilized by many real estate professionals through the State of Arizona.  Mr. Nero expressed remorse for his conduct and that he unjustifiably relied on the advice of people with licenses in the business and he believed what they told him. The phenomenon of "liar loans" in the housing market will be referenced and documented at the sentencing hearing, including footage from the  Documentary "House of Cards" reported by CNBC's David Faber on CNBC.  (See Exhibit C, summary blog of documentary.)

Prosecutions in this "Operation Cash Back" in Arizona ranged from deferred prosecution to the most serious involving Mario Bernadel who received a 17-year-term of imprisonment. In a case strikingly similar to the instant case in CR 08-255-PHX-GMS, United States v. Crandell, et. al, four defendants, Jeffrey Todd Crandell, Jake D. Whitman, Frederic Crum and Tyson K. Young, were indicted in a mortgage fraud scheme very similar to the one at issue in this case. Mr. Crandell and Mr. Whitman were accused of obtaining rights to various properties throughout Chandler, Gilbert, and Queen Creek, Arizona hiding their interest in the properties by placing them in the names of relatives or in corporate shells, and then recruiting friends and acquaintances to buy the properties for inflated prices. Similar to the practices employed by Mr. Nero and Mr. Fife, the defendants prepared the buyer's loan

applications which contained misrepresentations in order to persuade the lenders to approve the loans. Among other things, they inflated the buyers' incomes and assets and represented falsely that the buyers would be making the down payment. Instead, the defendants would pay the down payment at closing and also provide a cash kickback to the buyer. The financial institutions provided more than $6 million in loans before the properties were foreclosed.

Pursuant to a written plea agreement, on February 22, 2010, Mr. Nero plead guilty to Counts 1 through 3 of an information charging him with Attempted Evasion of Assessment and Payment of Federal Individual Income Taxes, in violation of 26 U.S.C. §7201. The terms of the plea agreement provide that Mr. Nero agreed to pay restitution and that he could be liable for restitution to the victims in the original indictment in an amount up to $3,600,821.96 or higher. However, there was no specific amount of restitution stipulated to by the parties, only that Mr. Nero would be responsible for restitution even though he did not plead to charges in the indictment which would give rise to restitution. Moreover, the parties agreed that Mr. Nero would have the opportunity to contest the amount of restitution.

Mr. Nero requests this Honorable Court consider the following matters in imposing a just sentence.

## II.    LAW AND ARGUMENT:

The "starting point and the initial benchmark" of any sentencing is the calculation of the applicable Guideline range. *Gall v. United States,* 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007) ( *Gall* ). However, the Guidelines are "not the only consideration"--a district judge should then "consider all of the factors [listed in 18 U.S.C. § 3553(a) ] to determine whether they support a sentence requested by a party." *Gall,* 128 S.Ct. at 596. The judge "may not presume that the Guidelines range is reasonable." *Gall,* 128 S.Ct. at 597.

However, "a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall,* 128 S.Ct. at 594. A sentence departing downward from the Guidelines to impose no or only nominal imprisonment "can be justified only by a careful impartial weighing of the

statutory sentencing factors." *United States v. Mcllrath,* 512 F.3d 421, 426 (7th Cir.2008) (quoting *United States v. Goldberg,* 491 F.3d 668, 673 (7th Cir.2007)). That said, the Supreme Court has held that requiring "extraordinary circumstances" to justify a sentence outside the Guidelines range or mandating the use of "a rigid mathematical formula" comes "too close to creating an impermissible presumption of unreasonableness for sentences outside the Guideline range." *Gall,* 128 S.Ct. at 595. A court should "impose a sentence sufficient, *but not greater than necessary,"* to comply with the purposes set out in § 3553. 18 U.S.C § 3553(a),

Under § 3553(a)(2)(B), a court must consider the need for the sentence imposed to afford adequate deterrence to criminal conduct generally. In this case, those individuals who devised, initiated and drove the scheme to defraud  lenders and the financial institutions are not before the Court. To harshly punish only Mr. Nero in these circumstances would not deter and could encourage others in positions of control to make decisions, such as here, to violate the law, knowing that those lower on the corporate ladder would bear the risks of detection and prosecution. A lengthy term of imprisonment for Mr. Nero could produce a result contrary to the instruction of § 3553(a)(2)(A) that a court shall consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *See Gall,* 128 S.Ct. at 599 ("a sentence of imprisonment may work to promote not respect, but derision of the law ...").

Here, defendant's guideline range is driven by the high loss amount from the proceeds of the sales, but does not account for the other factors driving the real estate market at the time including the proliferation of "flipping houses" publications in the mass media and in publications. The Court may appropriately consider these factors in deciding whether to impose a sentence outside the guidelines. See, e.g., *United States v. Ranum*, 353 F.Supp.2d 984, 989 (E.D.Wis.2005)(imposing non-guideline sentence where loss amount produced unnecessarily high range and defendant did not profit from offense); see also *United States v. Forchette*, 220 F.Supp.2d 914, 925-27 (E.D.Wis.2002) (departing downward where defendant did not devise the scheme and profited minimally).

## IV.    SENTENCING RECOMMENDATION AND MOTION FOR A VARIANCE:

### 1. The Nature and Circumstances of the Offense.

In imposing a reasonable sentence on Mr. Nero, the Court must consider the nature and circumstances of the offense of conviction. See 18 U.S.C. § 3553(a)(1). The United States may argue that the nature and circumstances of the underlying offenses which precipitated the plea agreement in this case do not merit this Court giving any consideration for a variance from the guideline sentence and may even suggest that an upward departure may be merited. See, United States' Response to Defendant Nero's Objections to Preliminary Restitution Amount and Government's Amended Response to Defendant Fife's Sentencing Memorandum.  However, Mr. Nero would suggest that this view is myopic given the vast complexities involving the mortgage crisis and the genesis of the problem. Indeed, one only need to be aware of the current news that this nation's largest banks appear to have been involved in large scale violations of the law in the manner in which home foreclosure's were processed.

In sum, Mr. Nero's offense of conviction is a serious offense for which Congress has provided a serious penalty, but there are also differences between all the counts in the indictment and the offenses to which he plead guilty. This Court should consider that this factor supports a variance from the 37 to 46 month sentence range under the Guidelines, because it is unlikely that any of the individuals that were the actual driving force behind the development of this fraudulent financial scheme will be prosecuted or  will receive sentences near that range for their roles in more serious conduct. Accordingly, this Court should  focus on a sentence appropriate for the offense of conviction, without too much reliance on conduct of others, and suggests a variance will lead to a more reasonable sentence than the guideline sentence.

### 2. Mr. Nero's History and Characteristics.

The Court should take into account, as mitigating factors in his sentencing, Mr. Nero's good qualities. Taken as a whole, Mr. Nero's personal history and characteristics support a variance.

Mr. Nero grew up in a close knit family with both of his parents, two sisters and a brother in Las Cruces, New Mexico. His parents have been married for over fifty (50) years and reportedly maintain a good relationship with all members of the family. Mr. Nero's father is a retired surgical technician who is a recovering alcoholic but otherwise healthy. Mr. Nero's mother, on the other hand, suffers from the onset of Parkinson's disease for which she is prescribed daily medication and therapy. While growing up, Mr. Nero reports that his parents were able to provide for all their needs adequately. When Mr. Nero was about 17 years of age, his family from Las Cruces to Tucson. All of his immediate family currently live in Tucson, Arizona. See, PSR ¶¶ 60, 61, 62.

Mr. Nero was born in Barstow, California with his birth name as Christopher Karl Sisneros but he legally changed his name in 1993 to Chris M. Nero. See, PSR ¶58 and ¶59. Mr. Nero dropped out of high school after completing the 11th grade when he was 17 years of age while still residing in Las Cruces but moved to Tucson, Arizona shortly thereafter. Mr. Nero has not had any further education or training since leaving school in 1983. See, PSR ¶¶ 62, 74.

Mr. Nero married Dolores Hernandez, his first wife in 1984, but this union lasted only until 1993 when they divorced. The marriage produced three children all of whom are now adults living in Tucson, Arizona. In spite of being a high school drop-out, Mr. Nero worked and was able to provide for all of family's needs. Even after the parties' divorced in 1993, Mr. Nero continued to provide support and comfort for his children. To this day, he continues to enjoy a good and supportive relationship with his children. See, PSR ¶63. Mr. Nero married again in 1997 but divorced in 2002. Mr. Nero has joint custody of his minor son and pays child support in the amount of $500.00 per month. Mr. Nero maintains a close and good relationship with his minor son. See, PSR ¶66. In 2008, Mr. Nero began a common-law relationship with Maria Bullock, and that union produced another child. See, PSR ¶67.

In each case, Mr. Nero had maintained a close relationship with his family. The PSR reports that all family members are aware of the nature of the charges against and all remain supportive.

Mr. Nero reports that he is a recovering alcoholic having drunk heavily for about fifteen years prior to stopping in approximately 2008 when he began attending substance abuse counseling sessions. Although Mr. Nero experienced problems with substance abuse over the course of his life, it does not appear that it prevented him from supporting his family or maintaining a positive relationship with his children. See PSR ¶ 70.

Mr. Nero has a criminal record but the vast majority of these offenses relate to his substance abuse problems.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2). Accordingly, the Court's sentence must: (I) "reflect the seriousness of the offense, [ ] promote respect for the law, and [ ] provide just punishment for the offense;" (ii) "afford adequate deterrence to criminal conduct;" (iii) "protect the public from further crimes of the defendant; and" (iv) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D).

Mr. Nero argues that the Court should vary from the guideline sentence because it is "greater than necessary" to achieve federal sentencing goals. In *United States v. Ministro-Tapia,* 470 F.3d 137 (2d Cir.2006), the Second Circuit held that, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of [18 U.S.C.] § 3553, it could not, consistent with the parsimony clause, impose the higher." *Id.* at 142. Because the Ninth Circuit has not provided specific instruction to the contrary, and because this Court should be reluctant to find that Congressional language has no meaning and then ignore it, the Court is urged to find the Second Circuit's holding persuasive. Perhaps the "not greater than necessary" language of 18 U.S.C. § 3553(a) is not an independent basis for the reduction of a criminal sentence as a departure or variance, but it is an additional check on the Court's sentencing analysis under *United States v. Booker* and 18 U.S.C. § 3553.

### 3.    To Reflect the Seriousness of the Offense.

It is important that the Court, throughout this sentencing process, not improperly minimize the seriousness of the offense for which Mr. Nero has been convicted. Nevertheless, the Court should not convinced that the imposition of the guideline term of imprisonment is consistent with the comparative seriousness of the offense. A guideline sentence would certainly reflect the seriousness of the offense and of the relevant conduct for which Mr. Nero was not convicted, but a sentence of four years of imprisonment also runs the risk of being perceived as excessive rather than as a reasonable sentence for the conduct underlying the actual convictions, and of overstating the seriousness of the offense. Indeed, Mr. Nero posits that the guideline sentence over-reflects the seriousness of the offense of conviction and puts too much emphasis on the relevant conduct for which he was not convicted. Giving Mr. Nero the guideline sentence would result in him receiving the heightened stigma associated with an offense that Congress and the Commission have selected as worthy of greater punishment than tax evasion. *Apprendi v. New Jersey*, 530 U.S. at 467, 120 S.Ct. 2348. In a dispassionate assessment of the facts in this case, a downward variance would still reflect the seriousness of the offense, properly take recognition of the relevant conduct, and better reflect the seriousness of Mr. Nero's criminal conduct

### 4.    To Promote Respect for the Law.

The count of conviction in this case is for a very serious offense, and promotion of respect for the law requires that the Court impose a suitably severe sentence that corresponds to the seriousness of the offense. However, the Court can take into account, when it deals with the respect-for-the-law factor, that most people-lawyers and lay citizens-would not imagine the result to which the Guidelines would lead the Court in this case, but would instead imagine a sentence more consistent with the crime for which Mr. Nero was convicted. Hence, respect for the law would suggest a sentence closer to the base offense level absent undue reliance on the factors underlying the real estate market fiasco, uncharged conduct and the conduct for which others are primarily responsible.

Rather than a slavish adherence to a mechanical calculation and application of the Guidelines, the Court must be mindful of its duty to produce a reasonable sentence. In this case, the Guidelines, rather than producing a sentence that promotes respect for the law, actually produce a sentence that most people would consider far out of line given the procedural history of this case.

**5.      To Provide Just Punishment for the Offense.**

Justice Stevens, in his dissent in *United States v. Watts*, recognized "that respected jurists all over the country have been critical of the interaction between the Sentencing Guidelines' mechanical approach and the application of a preponderance of the evidence standard to so-called relevant conduct." 519 U.S. at 164, 117 S.Ct. 633 (Stevens, J., dissenting). These criticisms often derive from situations in which a defendant has been charged with multiple counts, is acquitted on some counts, and yet still receives a sentence similar or identical to what he would have received had he been convicted of every count. See *United States v. Frias*, 983 F.2d 369, 395 (2d Cir.1993)(Newman, J., dissenting). In *United States v. Frias*, the Honorable Jon O. Newman, United States Circuit Judge, opined -in a case involving a defendant that had been convicted of two firearms offenses, acquitted of a drug conspiracy, but whose sentence based on relevant conduct was equivalent to what it would have been had he been convicted of the conspiracy-that "[a] just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal." *Id*. at 396 (Newman, J., dissenting).

Similarly, it would be unjust to sentence Mr. Nero precisely as if he had been convicted of each of the forty-eight counts on which he was indicted.  It would be unjust, under the facts and circumstances of this case, to emphasize that conduct more than that for which he was convicted.

Mr. Nero does not believe that the guideline sentence, with its extraordinary emphasis on relevant conduct for which he was not convicted, would be a just sentence. In *United States v. Carvajal*, No. 04 Cr. 222(AKH), 2005 WL 476125, 2005 U.S. Dist. LEXIS 3076 (S.D.N.Y. Feb. 22, 2005), the District Court for the Southern District of New York ruled that

"[a] judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life."

In this case, as suggested by the foregoing arguments, Mr. Nero was engaged in the business of "flipping houses" which was common among estate professionals. The affidavit of Frank Padilla, for example, attests to the facts that as an individual engaged in the business of "flipping houses," he not only relied on advise from Mr. Nero and Mr. Fife but from books readily available at any local bookstore, as well as local mortgage loan officers, Arizona State licensed property appraisers and experienced escrow officers. Likewise, Mr. Nero, during the course of these proceedings, filed a motion with this Court requesting permission to advance a "good faith" defense in that he relied on the advice of a licensed real estate attorney for his real estate dealings. A sentence that does not reflect the nature of real estate market at the time, the origins of its excesses and the fact that many of the principals for the over-all problems in the real estate market would only confirm that the individuals at the low end of the spectrum will serve as the "sacrificial lambs" for the punishment.

The Ninth Circuit Court of Appeals has recently sustained substantial and significant departures or variances in white-collar crimes cases where the facts and the unique circumstances of the defendant in each case was less compelling than in the case at bar. See, *United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (defendant admitting to using government credit cards for unauthorized personal purchases of between $350,000 and $500,000 sentenced to 40 days in jail, five years probation and restitution); *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (defendant with prior history of bank fraud in Arizona for stealing more than $3 million dollars plead guilty to bankruptcy fraud and false statement to bank sentenced to five years of probation with seven of those months under house arrest); *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (defendant convicted of selling more than $1 million counterfeit "access cards" for DirecTV Digital Satellite service sentenced to probation, community service and restitution.) The degree of harm to the community cannot be said to be any less in these cases than the circumstances before the District Court but the focus in the case at bar is almost exclusively on punishment rather than a comprehensive

analysis of all relevant factors. The guideline sentence would not be, under the circumstances of this case, just or reasonable.

**6.    Adequate Deterrence to the Criminal Conduct in Which Nero Engaged**

Cases support the proposition that connection between age and the risk of recidivism has been recognized by many courts as a mitigating factor. See, *United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y.2005)(Sifton, J.)( "Post-Booker courts have noted that recidivism is markedly lower for older defendants.")

Mr. Nero is forty-three years of age with continuing responsibilities for maintaining support for minor children. Mr. Nero has not failed in his family obligations as he has always been able to appropriately provide for his family. While he does have a criminal history, the majority of these offenses can be related to his substance abuse. This is not an attempt to minimize the nature of Mr. Nero's offenses, or to marginalize the impact of the conduct of the community as a whole but the need have the sentence in  this case be considered a deterrent is not as significant a factor as the other factors under §3553(a). What the Court must do is fashion a sentence that will, as much as possible, deter this kind of conduct without disregarding other 18 U.S.C. § 3553(a) factors.

In this case, Mr. Nero will not only be responsible for paying a significant tax obligation, he will also be responsible for paying an even larger restitution amount. The best gauge for this Court's monitoring of Mr. Nero's conduct is to maintain vigilance over his affairs through a period of probation rather than a lengthy period of time in prison.

**7.    The Need to Avoid Unwarranted Sentence Disparity.**

Mr. Nero contends that a variance is necessary to make certain that Mr. Nero does not receive the bulk of the punishment for the conduct underlying the offenses of conviction and the for which he was indicted. Moreover, as suggested herein, many of those ultimately responsible be for the collapse of the housing market and the problems with the home loan industry may never be prosecuted even though there actions are certainly more culpable.

In the case referred to above, *United States v. Crandell*, et.al., supra, one of the leaders in the fraudulent scheme reached a sentence of 10 months even though more than $6 million dollars in loans were fraudulently obtained. See also, *United States v. Hensley*, 363 F. Supp. 2d 843 (W.D. Va. 2005) (post *Booker,* where defendant pled guilty to distribution of meth and guidelines were 37-46 months, court imposed 12 months to avoid disparity with co-defendant's 6 month sentence merely because co-defendant went to the government first).

**8.      A Long Sentence Would Impair Mr. Nero' Rehabilitation**.

Any sentence that is longer than necessary can impeded rehabilitative goals of incarceration, *See*, *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (in drug/gun case for which guidelines advised 188-235 months, a 120-month sentence was upheld because it sufficiently reflected the seriousness of the offenses while allowing the possibility for defendant to reform and go on to a productive life upon release in his mid-thirties); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (district court's finding that man convicted of one count of child porn possession would not be adequately accommodated in prison and would be better served by outpatient psychiatric treatment supported reasonableness of imposing five years probation rather than a guideline term of 41-51months); *United States v. Moreland*, 568 F.Supp.2d 674 (S.D. W.Va. 2008) (after rejecting career offender guideline range of 30 years to life, court imposes statutory mandatory minimum of 120 months for a 34-year-old defendant whose educational record reflected a rehabilitative hope the judge decided should not be quashed by a sentence leaving little to hope for beyond imprisonment); *United States v. Stern*, 590 F.Supp.2d 945 (N.D. Ohio, Dec. 19, 2008) (in imposing 12 months and a day on child porn defendant who had never engaged in physical misconduct with an actual child, court observed that lengthier term might negatively impact the rehabilitation Stern commenced prior to his arrest); *United States . v. Pallowick*, 364 F. Supp. 2d 923 (E.D. Wisc. 2005) (defendant convicted of six armed bank robberies sentenced to 46 months, rather than guideline range of 70-87 months, because no one was hurt, defendant made no direct threats, his only prior was a burglary committed shortly before, his severe mental illness of major depressive disorder and anxiety disorder played a major role in the offenses, after arrest he

completed in-patient treatment, enrolled in counseling, and took medication, he was not dangerous and unlikely to re-offend, and judge concluded that a lengthier period would not aid rehabilitation but might hinder his progress in counseling, contrary to § 3553(a)(2)(D))

### 9.    Effect of Imprisonment On Third Parties.

Mr. Nero's incarceration would have harsh effect on his family members particularly his common law wife and minor children, and his elderly, ailing parents, upon whom they depend for support. U.S.S.G. § 5H1.6 generally discourages departures on this basis. The PROTECT Act amendments of April 30, 2003 made family ties and responsibilities "not relevant" in child victim, sex abuse and exploitation, obscenity offenses, and related crimes. However, the Supreme Court's decisions in *Booker* and *Rita* free courts to consider these factors as part of their analysis under § 3553(a). *See, United States . v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute 100 grams of heroin, despite a guideline range of 46-57 months, based on his long work career, community support, lack of a criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would re-offend); *United States . v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (on remand of bank fraud case, district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care existed); *United States v. Dominguez*, 296 F.3d 192 (3d Cir.2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependant on her); *United States v. Owens*, 145 F.3d 923 (7th Cir. 1998) (departure from 169 to 120 months under § 5H1.6 for defendant who maintained good relationship with his children and court believed his active role raising and supporting his family was atypical for crack dealer and imprisonment may have forced wife on public-assistance and defendant also spent time with brother with Downs Syndrome); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. Jan. 17, 2008) (sentence of probation affirmed where justified by the atypical nature and circumstances of the felon in possession case and by the defendant's need to care for her nine year-old developmentally-disabled son); *United States v. Menyweather*, 431 F.3d 692 (9th Cir.

2005) ( in $500,000 embezzlement case, no abuse of discretion to depart 8 levels to probation in part because of defendant's care for daughter, which was unusual compared to other single parents); *United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) (departure granted for defendant who was sole care giver of suicidal wife who also suffered from renal failure); *United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) (district court had discretion to depart downward 4 levels for extraordinary family circumstance that defendant's 8-year old son had lost his father and would be losing his mother for substantial amount of time); *United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999) (3-level departure to make defendant eligible for shock incarceration was warranted under § 5H1.6 to minimize impact on children where defendant supported 4 young children and his wife worked 14 hour days, miles from home, was barely able to provide for children and risked losing custody of her children and her job, and no extended family could take custody of them); *United States v. Bailey*, 369 F. Supp. 2d 1090 (D. Neb. 2005) (post-*Booker* departure from 24-27 months to probation for defendant convicted of possessing child porn justified by expert testimony showing his presence was critical to his own child's recovery from molestation by a boyfriend of the child's mother, and there was reasonable expert assurance that Bailey was not dangerous to the public (including children), and the benefit to the public of incarcerating Bailey was outweighed by the harm it would cause to his daughter); *United States v. Manasrah*, 347 F. Supp. 2d 634 (E.D. Wis. 2004) (judge departs two levels to probation with home detention for immigrant from West Bank, convicted of mail fraud where husband threatened take the children back to the West Bank and to not let defendant see them again if wife incarcerated, a harm "far worse than those faced by a defendant-parent and her children in the usual case."); *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) (downward departure granted in heroin case where defendant's two young children were thrust into the care of relatives who reported extreme difficulties raising them, both fathers were absent); *United States v. Lopez*, 28 F. Supp. 2d 953 (E.D.Pa.1998) (six-level departure granted defendant who pled guilty to conspiracy to distribute heroin and forfeiture charge where defendant's mentally ill seven-year-old attempted suicide after defendant's arrest and defendant's parental rights would be

terminated under full range of incarceration, and defendant was not involved in large-scale drug dealing).

**IV.   CONCLUSION:**

For the foregoing reasons, Mr. Nero respectfully requests that this court review the record, the facts and arguments contained in this memorandum, all the exhibits and letters of recommendations, the back taxes which Mr. Nero will have to pay, the amount of restitution and find that substantial mitigating factors have been presented to warrant the imposition of a sentence of probation with no further incarceration necessary under the circumstances of this case.

RESPECTFULLY SUBMITTED this date, October 25, 2010.


*S/Andrea L. Matheson*
ANDREA L. MATHESON
Attorney for Chris Nero

Original filed via CM/ECF this date to:

The Honorable Cindy K. Jorgenson
U.S. District Court Judge

Assistant United States Attorney
Jonathan B. Granoff, Esq.